(97 South. 404)

No. 24894.

PARKERSON v. OGDEN et al.

(Dec. 29, 1922. On Rehearing, July 11, 1923. Motion to Correct Decree Denied July 27, 1923.)

*(Syllabus by Editorial Staff.)*

1. Attorney and client ⟨≈⟩166(3)—Evidence held insufficient to show contract for interest in land recovered.

Evidence *held* insufficient to show contract by defendants to give attorney engaged in connection with suit to recover land and afterwards collecting royalties from lands recovered an interest in the land, rather than a percentage of moneys collected.

2. Evidence ⟨≈⟩119(3)—Letters from party to third persons held not res gestæ and not admissible.

In action by attorney's executrix on alleged contract by clients to give him an interest in land recovered, letters written by the deceased attorney to another attorney and a third person, neither of whom had authority to represent the clients in dealing with him, were no part of the res gestæ and were not admissible.

St. Paul and Rogers, JJ., dissenting.

Appeal from Civil District Court, Parish of Orleans; Hugh C. Cage, Judge.

Suit by Mrs. Camilla Putman Parkerson, testamentary executrix of William S. Parkerson, against Marie Ogden and others. From a judgment for plaintiff, defendants appeal. Judgment annulled and set aside, and plaintiff's demand rejected.

Donelson Caffery and Herman Winsberg, both of New Orleans, for appellants.

Merrick & Schwarz, of New Orleans, for appellee.

OVERTON, J. The Ogden heirs claimed the ownership of certain lands in Hardin county, Tex., and engaged the services of W. S. Parkerson, Esq., now deceased, to recover the property. Shortly afterwards, Parkerson advised the Ogdens that Henry C. Mayer, Esq., of Galveston, Tex., was in

New Orleans, and was willing to accept employment in the case. Arrangements were made by which Mayer and others who were to assist in the matter, not including Parkerson, would receive one-half of the land recovered. Miss Marie Ogden, one of the heirs, who seems to have represented her coheirs in the long relationship that existed between them and Parkerson, states that the latter said he was not in position to attend to legal business in Texas, and therefore recommended the employment of Mayer. Miss Ogden further states that when it was concluded to employ Mayer she requested Parkerson not to abandon her and her coheirs, but to continue to assist them, and that Parkerson agreed to comply with her request. Suits were filed in Texas, though it does not appear that Parkerson took an active part in them, and judgments were recovered in some instances, and compromises made in others; and, as a result, the Ogdens recovered, in various parcels, something in excess of 600 acres of land.

In April, 1902, the Ogdens executed a power of attorney authorizing and empowering Parkerson to sell their interest in the lands mentioned, which had been, or might thereafter be, recovered for them; and to compromise and adjust their claims to any part of that interest; and to convey a half interest in the lands recovered to the attorneys and others, who had represented them in prosecuting their claims. In due course, a deed was executed to Mayer and his Texas associates for their services. Partitions were effected among the parties in interest, the Ogdens receiving their part, in the main, in indivision with those who had rendered them financial assistance in recovering the property, though it seems that the Ogdens received, as did the others, a few parcels separately. These partitions were made about the year 1905, with the exception of one, which was made after Parkerson's death, and involved only a very small quantity of land. The partitions were effected by friendly suits.

Prior to 1906, the land does not appear to have produced any revenue, but during that year oil was discovered on a part of it. Up to that time Parkerson seems to have advised the Ogdens in a general way and to have acted for them under the power of attorney. All correspondence with those representing the Ogden interests in Texas seems to have been conducted by him, and the Ogdens apparently relied on his judgment in matters affecting their interests. When the royalties from the oil leases began coming in, Parkerson, up to the time of his death, received the money from that source regularly, and after deducting a percentage for himself, and after paying expenses, when there were any to be paid, remitted the balance to the Ogdens and to a Mr. Harry Da Ponte, who appears to have had an interest in the land, or, at least, in most of it, in indivision with the Ogdens. In 1915, about 14 years after Parkerson was first consulted by the Ogdens, in reference to this land, and 9 years after he began remitting the proceeds of the royalties received, he died. His son Stirling Parkerson, a member of the bar, continued, at the request of the Ogdens, to attend to the business intrusted by them to his father. Stirling Parkerson paid the percentage or part, deducted by him, to his father's estate, which was the same percentage as that which his father has customarily deducted. In rendering accounts to the Ogdens, he showed, at least in one instance, that the amounts thus deducted went to his father's estate, and not to him. However, it does not appear that he stated the reason, in accounting, for that disposition of the percentage deducted.

Approximately a year after Stirling Parkerson took charge, he requested Miss Marie Ogden to execute in favor of his father's estate a deed to one-tenth of their interest

in the property mentioned, as the compensation due his father, under an alleged contract, for his father's services in recovering the property; but Miss Marie Ogden, and the remaining heirs, refused to execute the deed. This caused a severance of legal relations between Stirling Parkerson and the Ogdens; and this suit followed, in which the testamentary executrix of the estate of William S. Parkerson, deceased, in her said capacity, and as widow in community, and as natural tutrix of her minor children, together with the major heirs of the deceased, sue the Ogdens to have the succession of William S. Parkerson decreed to be entitled to one-tenth of the interest in the land recovered by the Ogdens; to require the Ogdens to execute a deed in favor of the succession of Parkerson for that one-tenth; and to render an accounting of all funds received by them from the lands mentioned since April 19, 1916, and to pay the succession one-tenth of the amount so received, after deducting all amounts spent for taxes or other necessary expenses in preserving and developing the property.

[1] The vital question in the case is whether or not there was a contract to the effect that W. S. Parkerson should have for his services the interest now claimed for his succession by his widow, heirs, and executrix. Plaintiffs contend that there was such a contract, but that it has been lost or destroyed, and defendants assert that there was no such agreement.

When Mayer was employed through Parkerson, and Miss Ogden made the request of Parkerson not to abandon her and her coheirs, she testified, in making a general statement of the facts, touching the issues involved, that Parkerson, after replying that he would not abandon them, stated that he would charge them 10 per cent. of what they received. After she made her statement, and while she was still being examined in chief, her counsel asked her the following question: "You said in the beginning that he was to get 10 per cent. of what you got?" and she replied, "of the amounts which he received from Texas," and she then went on to say that he, at no time, claimed any part of the land. Hence we conclude that this second answer expresses what she intended to say in the first instance, and that her version of the agreement is, that Parkerson was to receive no part of the land, but was to receive 10 per cent. of whatever amounts that might be derived from it; and we also infer from her evidence, given later on, that his right to claim any part of that percentage should continue only during the time he acted as attorney at law or in fact for the Ogdens. On the other hand, it is the contention of plaintiffs, as we appreciate it, that the evidence shows that the agreement, after Mayer was employed, was that Parkerson should receive one-tenth of the land that the Ogdens might recover, and that, as the agreement was merely verbal, when made, a contract was later signed by all the parties in interest recognizing that right.

If such a written contract, fixing the rights or compensation of Parkerson in the matter, ever existed, the evidence unmistakably shows that it has been lost or destroyed. Miss Marie Ogden testified that she has no recollection of signing such a contract. Her evidence leaves the impression that, if a written contract was ever signed, in reference to what Parkerson was to receive, it was purely a confirmation of the oral one testified to by her. Her sister and her brothers deny that they ever agreed to give Parkerson one-tenth of their interest in the land remaining after complying with their contract with Mayer, and testify that the only agreement in reference to Parkerson's compensation was the oral one testified to by Miss Marie Ogden. On the other hand, Stirling Parkerson's evidence, in this connection, is to the effect that,

when he first mentioned to Miss Marie Ogden his desire that she and her coheirs execute a deed to his father's succession, she raised no question as to his right to one, but passed the matter off; and that afterwards, when it was discussed more in detail, she first took the position that there had been a contract recognizing W. S. Parkerson's right to an interest in the land, but that it had been superseded by an agreement to take 10 per cent. of its proceeds, and still later assumed the position that, at no time, had there been such a contract. Miss Ogden does not confirm this evidence, but testifies that, when the execution of the deed was first mentioned to her by Stirling Parkerson, she stated that there never had been an agreement to give his father an interest in the land; however that, as she was too sick a woman to stand a lawsuit, she would sign such a deed, if her sister and brothers would agree to sign it. She further testified that they refused to execute the deed for the reason that they were under no obligation to do so, and hence that she refused.

Stirling Parkerson also testified that, after his father's death and before any question had arisen with Miss Ogden in reference to the execution of the deed to his father's estate, Harry Da Ponte, on two or three occasions, called at his office to obtain information from a document, in which he was interested, which was kept among the Ogden papers, in an iron safe; that, on each of these occasions, in searching for the document, which Da Ponte desired, he came across one which he recognized as being his father's contract with the Ogdens; that Da Ponte, each time, thought that it was the document he desired, but that he (Parkerson) informed Da Ponte that it was not, and handed the document to the latter, who returned it, verifying the statement made. Da Ponte corroborates Parkerson as to what happened on those occasions, and states that he had seen the contract before, though he does not testify as to its contents.

After the above occasions, but prior to the time that any question had arisen relative to the execution of a deed to the Parkerson succession, Miss Ogden called at Stirling Parkerson's office, and in the course of the conversation concerning the business intrusted to him, offered to take the papers, which were in disorder in the safe, and list each one of them and place them in order. Parkerson, not having then acquired familiarity with their contents, and not having time either to acquire it or place them in proper order, due to the pressure of other business, delivered the papers to Miss Ogden. She retained them for three or four weeks. Some weeks after their return, Parkerson obtained an opportunity to familiarize himself with them, and says that in looking over the papers he failed to find the document, which he had recognized as his father's contract, and has been unable to find it since, after a most diligent search.

Plaintiffs, in order to show that there was a written contract, and that W. S. Parkerson had an interest in the land, offered copies of two letters written by him to Miss Marie Ogden. In the first, which is dated May 26, 1905, Parkerson states that "where so many are concerned I think best to have each interest clearly defined," and requests her to obtain "her brother's signature to the contract," and states that he and Da Ponte leave for Beaumont during the following week. In the second, he thanks Miss Ogden for the trouble that she has taken "to get her brother's signature to the contract," and agrees with her that it will enhance the leasing of the property to hold "our interest undivided for the present." The originals of these letters were not offered, because they were not produced. In fact, Miss Ogden and her sister and brothers deny possessing knowledge of them, or of their contents.

The evidence, however, satisfies us that they were received.

Plaintiffs also offered in evidence a letter to Stirling Parkerson, written soon after W. S. Parkerson's death, by H. C. Mayer, who represented the Ogdens in Texas. In this letter, which is rather lengthy, Mayer discusses certain business matters relative to the property in Texas, and endeavors to give young Parkerson some idea of the Ogden interests in that state, so that he might understand the situation; and, after asking for certain information, in the concluding paragraph, says:

"As I understood the contract between your late father and the Ogden heirs he was to receive 10 per cent. of what land they recovered in the Ximenes league" (the land in question) "for the Ogdens."

Stirling Parkerson testified that he showed this letter to Miss Ogden. He does not, however, recall her comments on the letter. In fact, he bases his evidence that he showed it to her more upon a contemporary document than upon his memory. He does recall, however, that she did not question the correctness of the excerpt quoted, for up to that time the question of the execution of a deed to the Parkerson succession had not arisen; and, therefore, if she had questioned the correctness of the excerpt, her doing so would have impressed him.

[2] Plaintiffs offered in evidence two letters written by W. S. Parkerson, one in 1905, addressed to Mayer, and the other in 1908, addressed to Da Ponte, to show that Parkerson had an interest in the land, and a contract. When the Mayer letter was offered, it was objected to on the ground that it was written to one not a party to the suit; and, secondly, because only a copy of it was offered, without any foundation having been laid for secondary evidence. The objections were overruled by the court below; and the ruling was made to apply to all similar offerings, with the proper bill of exceptions reserved. The letter to Da Ponte was offered immediately afterwards, and we therefore take it that it is included in the same objections, ruling, and bill as the Mayer letter.

The first objection should have been sustained. Under no theory were these letters admissible. They formed no part of the correspondence between W. S. Parkerson and the Ogdens. There is not even the slightest evidence to show that either Mayer or Da Ponte had any authority whatever to represent the Ogdens in their relations with Parkerson. The statements in the letters, therefore, amount to nothing more than statements made to third persons. They form no part of the res gestæ, as suggested by plaintiffs.

In order to show the manner in which W. S. Parkerson made deductions in his own behalf from the money received by him from the land, quite a number of accounts, extending over nine years, and letters including accounts, have been offered in evidence, their purpose being to show whether Parkerson made the deductions as a co-owner, or for services rendered, as an attorney, and thereby show whether he had an interest in the land. In rendering his accounts to the Ogdens, he deducted 10 per cent., or one-tenth (sometimes using the first expression, though frequently the latter), from the amounts received by him for the joint account of the Ogdens and Da Ponte, that account being joint for the reason that those interests were held in indivision. In two or three instances, after the year 1909, Parkerson referred to the deductions made for himself as being his portion or his interest. In one instance, in which timber was sold through others, he made the usual deduction for himself. Until the latter part of 1909, with one or two exceptions, he made the deductions from the gross amounts, thus treating them as charges for services rather than as deductions of his interest, as part

owner, in the funds received. In the latter part of that year, Miss Ogden, entertaining the view that the charge should be on the net amount that she and her coheirs received, as she understood he was to have 10 per cent. of that amount and not of the gross, complained to him of the latter charge. In his next letter, in rendering an account, he stated, in reply to her complaint, that—

"In every account which I have rendered you, I have charged 10 per cent. on the gross amount, and for the services which I have to render that is the proper way to make the charge. Therefore my charge will be 10 per cent. on $1,329.56, which is $132.95."

On the original of the letter, in which the above statement was made, there was found written in pencil a memorandum reading:

"If he had an interest in the land this would not be the proper way to make the charge."

This notation, we think, however, is satisfactorily explained by Miss Ogden when she says that it was made when she "was straightening the business out with Mr. Stirling Parkerson." In our view, it was evidently made after the question of the execution of a deed to the Parkerson estate had arisen, and probably during the period in which Miss Ogden had the execution of such a deed under consideration with her brothers and sister. The language of the notation indicates that it was made to show that W. S. Parkerson had no interest in the land, and hence that the Ogdens were under no obligation to execute the deed demanded. Furthermore, Miss Ogden, in complaining to W. S. Parkerson of the charge on the gross instead of on the net, did not make as the basis of her complaint the asserted fact that he had an interest in the land, but merely observed that she noted that he had charged 10 per cent. on the gross, which she did not consider the proper way of charging. In her reply to Parkerson she still maintained the correctness of her position, though she apparently acquiesced in his method of charging. Parkerson did not avail himself of that acquiescence thereafter. There was nothing said by her relative to any interest that he might have had in the land, nor, for that matter, did he mention any. We therefore conclude, as stated, that the notation was made, when Miss Ogden had under consideration with her coheirs the question of the execution of a deed to the Parkerson estate, in compliance with Stirling Parkerson's demand, and that it was not made for the purpose of proving to W. S. Parkerson that, as he had an interest in the land, and as he had a right to make deductions for himself only in accordance with that interest, and in no other respect, the charge should have been on the net and not on the gross, but was made in determining whether or not to comply with Stirling Parkerson's demand.

Considering the evidence, as a whole, we are of the opinion that plaintiffs have failed to prove their case. We so think, because the evidence does not show with legal certainty that a contract was executed, which entitled W. S. Parkerson to an interest in the land. Granting that there was a contract of some kind, executed in 1905, defining the interest of the various parties concerned, which the evidence seems to indicate, still it does not appear from that evidence that the contract recognized W. S. Parkerson as having an interest. It is true, in one of his letters, in referring to the interest in his charge, he speaks of those interests as "our interest"; yet such expressions are not infrequently used in conversation and correspondence, in such a connection, with no intention of claiming an interest. The evidence of Mr. Stirling Parkerson not only fails to identify, as does the remaining evidence in the record, the instrument that he recognized as his father's contract with the one that seems to have been executed in 1905, but, moreover, it does not go far enough to establish the substance of such a contract, if it existed, and,

besides, the knowledge on which his evidence is based was manifestly gained in such a hasty manner that it is clearly subject to error. Mr. Parkerson has only an impression that the instrument he saw was signed by all of the heirs and does not name any one of them who, he can say with certainty, signed it. He does not say that it was an instrument defining the interests of the various parties concerned, which the letter of 1905 seems to indicate that it was, if a contract defining those interests was signed. Apparently, he does not know whether it defined those interests or not. He does not recall whether the instrument described the property in detail, although, if it did so describe it, judging from the description in the petition, it must have required some two or three pages to have done so. All that he recalls is that the instrument referred to the Texas land and obligated the Ogdens to transfer to his father a one-tenth interest in it, in consideration of the latter's services. It is clear that Mr. Parkerson's knowledge was acquired by merely glancing over the instrument which he saw. In fact, he does not claim to have read the document word for word. Knowledge acquired merely by glancing over an instrument is not unlikely to be erroneous. The evidence of Da Ponte is not sufficient to supply the deficiency in proof, nor is the evidence, which is conflicting, relative to the change in position of Miss Ogden, when spoken to relative to the execution of the deed, sufficient. Furthermore, the statement of W. S. Parkerson, quoted above, from his letter of 1909, in making the deductions for himself from moneys received, shows that the deduction made on that occasion, and those made in the past, were charges for services, and nothing more. That statement also serves to explain, we think, future charges and tends to show that he attached no significance to the use on two or three occasions of such expressions as "my interest" and "my portion." If there was a contract of the nature sued upon in this case, it was in existence when the above statement was made, and entitled Mr. Parkerson to a one-tenth interest in the property that had been recovered; yet no reference was made to it, though a reason existed for mentioning it, and none for treating the matter merely as a charge for services. Mayer, who had a contract very similar to the one herein alleged to have been executed, received his part of the property, long prior to this, and before the discovery of oil on the land. Parkerson secured no deed, under apparently similar circumstances, and this notwithstanding the land rose greatly in value, because of the discovery of oil. There must have been some reason for his failure to secure one, other than mere neglect. The evidence justifies the inference that no deed was secured by him during that long interval because he was entitled to none. Under the facts of this case, we cannot order that one be executed.

In determining whether or not the contract alleged herein existed, we have examined the record carefully to ascertain whether Miss Ogden suppressed any evidence bearing on the question, but fail, as our conclusion indicates, to find that she did.

For the reasons assigned, it is ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and set aside, and that plaintiffs' demand be rejected and disallowed at their costs in both courts.

ST. PAUL and ROGERS, JJ., dissent.

### On Rehearing.

O'NIELL, C. J. Having studied the record in this case again, with the aid of the very strong arguments and briefs on the rehearing, we find yet that the case which

plaintiff has made out is too doubtful to establish title to an interest in the land held by the defendants. The short question in the case was whether the interest of the late William S. Parkerson was a commission of 10 per cent. of the collections he made, for the current services which he was rendering from 1901 to 1915, or was a tenth interest in the land itself. Although the letters relied upon by the plaintiff have some bearing upon the question, they do not decide it. Without any reason to doubt the veracity of any one who testified in the case, we cannot say that there is actual proof, or a preponderance of evidence, in favor of the plaintiff.

The decree rendered by this court on the 29th of December, 1922, is now reinstated and made final.

ST. PAUL and ROGERS, JJ., dissent.